[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff, Metro Mobile CTS, Inc., on behalf of itself and its subsidiaries, Metro Mobile CTS of Fairfield County, Inc., Metro Mobile CTS of Hartford, Inc., Metro Mobile CTS of New Haven, Inc., and Metrol Mobile CTS of New London, Inc., (collectively, Metro Mobile), appeals a decision of the defendant Department of Public Utility Control (DPUC) ordering an increase in the cellular interconnect rates charged by Southern New England Telephone Company (SNETCO) and paid by Metro Mobile. The appeal is brought pursuant to General Statutes 4-183 and 16-35. The court finds in favor of the defendants.
SNETCO and Southern New England Telecommunications Corporation (SNET) are also named as defendants and fully participated in this appeal. The remaining defendants are independent public or private entities which were granted party or intervenor status in the underlying DPUC proceedings, designated DPUC Docket No. 89-12-05.
The following facts are undisputed or reflected in the record. On or about December 15, 1989, the DPUC established Docket No. 89-12-05 to investigate the operational and financial status of SNETCO and to determine what changes in rates, if any, were required. SNETCO was designated a party to those proceedings. On or about March 2, 1990, Metro Mobile petitioned the DPUC to be designated a party to the proceedings. On or about March 26, 1990, the DPUC denied Metro Mobile's petition but designated Metro Mobile an intervenor.
The DPUC bifurcated the proceedings into two phases. In Phase I, the DPUC determined that SNETCO required a revenue increase of $47.5 million ($52.7 million with provisions for curtailment) The DPUC's decision in Phase I was issued on March 20, 1991. In Phase II, the DPUC addressed the issues of SNETCO's cost of services and rate design. The Phase II decision, dated June 28, 1991, and mailed to all parties of record on July 8, 1991, ordered, inter alia, that the usage rates applicable to the cellular interconnect service be increased by 35%. This appeal is from that Phase II decision of the DPUC.
The DPUC admits Metro Mobile's allegation that its subsidiaries are licensed by the Federal Communications Commission (FCC) to provide domestic public cellular radio CT Page 7187 telecommunications service (cellular service) in four of Connecticut's six cellular service areas. The DPUC also admits that the other cellular service carrier licensed by the FCC to operate in each of these four areas is Springwich Cellular Limited Partnership (Springwich), an affiliate of SNETCO. Springwich is a limited partnership whose general partner is SNET Cellular. SNET Cellular and SNETCO are subsidiaries of SNET.
Cellular service is the provision of high-capacity communications to, from or between vehicle-mounted and hand-held radio telephones using interrelated radio frequency transmission and receiving sites. Cellular service between radio telephones and wireline telephones is provided by means of an interconnection, for which SNETCO charges cellular interconnect rates. These rates are determined by applying a 25% surcharge to SNETCO's Select-a-Call usage charges. The Phase II decision increases the surcharge by 35%. Metro Mobile and Springwich are SNETCO's only two cellular interconnect ratepayers.
AGGRIEVEMENT
Metro Mobile brings this appeal pursuant to 4-183 and16-35 of the General Statutes, Section 16-35 provides:
 Any company, town, city, borough, corporation or person aggrieved by any order, authorization or decision of the department of public utility control . . . in any matter to which he or it was or ought to have been made a party, may appeal therefrom in accordance with the provisions of section 4-183. . . . (Emphasis added.)
Section 4-183 provides, in part:
 (a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the superior court as provided in this section. . . . (Emphasis added.)
Proof of aggrievement is a prerequisite to a trial court's jurisdiction over the subject matter of an administrative appeal. Light Rigging Co. v. DPUC, 219 Conn. 168, 172 (1991) (citation omitted).
 "`"[T]he fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, `the party claiming aggrievement must successfully demonstrate a specific personal and CT Page 7188 legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that the specific personal and legal interest has been specially and injuriously affected by the decision.' . . ."' (Citations omitted.)
Id., 173.
Metro Mobile, as holder of an FCC license and provider of cellular service, has a specific personal and legal interest in the cellular interconnect rates which it must pay SNETCO. That interest is specially and injuriously affected by the decision in that the decision increases the rates which SNETCO charges Metro Mobile. Therefore, this court finds Metro Mobile aggrieved.
However, 16-35 only allows a plaintiff to appeal a decision of the DPUC in a "matter to which he or it was or ought to have been made a party." Metro Mobile petitioned to be made a party in the proceedings but the DPUC only granted it intervenor status. Metro Mobile argues that it ought to have been made a party. This court agrees.
Section 4-177a of the General Statutes, part of the Uniform Administrative Procedure Act (UAPA), provides, in relevant part:
 (a) The presiding officer shall grant a person status as a party in a contested case if that officer finds that: (1) Such person has submitted a written petition . . .; and (2) the petition states facts that demonstrate that the petitioner's legal rights, duties or privileges shall be specifically affected by the agency's decision in the contested case.
Similarly the DPUC's regulations provide that it shall designate as parties, "those persons whose legal rights, duties or privileges are being determined in the contested case. . . ." Conn. Agency Regulations 16-1-16.
Since the DPUC's decision determined the legal rights and duties of Metro Mobile as a cellular interconnect ratepayer in the contested case under review, the court concludes that it was entitled to be a party and "ought to have been made a party" to the case within the meaning of the statutes. Accordingly, Metro Mobile has standing to maintain this appeal.
DUE PROCESS CLAIMS CT Page 7189
Metro Mobile urges the court to vacate the DPUC's decision on grounds that the DPUC's failure to grant Metro Mobile party status deprived Metro Mobile of due process. Specifically, Metro Mobile argues that as a party, it could have introduced evidence on the cellular service industry and the unique financial situation encountered by a competitor in a duopoly market (Metro Mobile and Springwich).
General Statutes 4-177a and the DPUC's regulations allow the presiding officer to limit the participation of an intervenor but do not require such limitation. In its response to Metro Mobile's request for party status, the DPUC in no way limited the participation of Metro Mobile. Furthermore, Metro Mobile cites no specific instances of prejudice resulting from its designation as an intervenor. Metro Mobile does not identify any specific request on its part to submit particular evidence or participate in the proceedings which was denied by the DPUC because of its intervenor status.
Also, when the DPUC issued its draft decision dated June 14, 1991, it issued a notice that pursuant to 4-179, it would "accept written exceptions and briefs from, and hear oral arguments by, admitted parties and intervenors concerning the draft decision. . . ." Metro Mobile in fact submitted written exceptions and presented oral argument to the DPUC concerning the draft decision.
This court finds that Metro Mobile had sufficient opportunity to participate fully in the proceedings as though it had been designated a party. "`A fundamental requirement of due process is "the opportunity to be heard." . . .'" Rogers v. CHRO, 195 Conn. 543, 548-49 (1985) (citation omitted). That a plaintiff does not avail itself of this opportunity does not render the proceedings unconstitutional. See id., 549. The court concludes that although Metro Mobile ought to have been designated a party, failure to do so did not deny Metro Mobile due process and is not grounds for vacating the DPUC's decision.
SUFFICIENCY OF RECORD EVIDENCE
Metro Mobile also claims that because SNETCO's schedule of amended rates and charges submitted to DPUC did not include an increase in cellular interconnect rates, no evidence was introduced regarding those rates. Therefore, Metro Mobile argues, there was no evidence in the record of a "need" to increase cellular interconnect rates and no evidence to "justify" the DPUC's order increasing those rates. Metro Mobile asserts that nothing in the record indicates that there was any rational reason for "such a large increase" in cellular CT Page 7190 interconnect rates. The court is not persuaded by this claim.
The need to increase SNETCO's revenue had already been determined in Phase I. That being so, the DPUC's rate structuring policy became a controlling factor in the allocation of that revenue increase among the various services which SNETCO offers and for which it charges its rate payers such as Metro Mobile. The DPUC's announced policy is to keep charges for basic exchange services, such as residential service, below cost in order to foster wider use and, eventually, universal service. Therefore, other services are charged not only to cover their costs but charged additionally to contribute to the cost of the basic exchange services. This is a long-standing policy of the DPUC and Metro Mobile does not object to it in principle. Furthermore, our Supreme Court has approved the application of such policy considerations to ratemaking. In Greenwich v. DPUC,219 Conn. 121, 126 (1991), the court held as follows:
 The DPUC's enabling statute thus evinces a legislative intent to rely on the DPUC to regulate and supervise public utilities, and to establish rates that are not unreasonable. The legislature, however, has not imposed upon the DPUC any specific formula or policy to use in setting rates. In view of the remedial purpose of the statute, the lack of an express statutory formula and the evident legislative intent to rely on the DPUC's expertise, we conclude that the language of the enabling statute is sufficiently flexible to permit the DPUC to create necessary policies, including rate equalization, to guide its rate-making decisions.
See also General Statutes 16-19(a), 16-19e(a)(4), 16-11. Applying its policy of setting rates to foster universal service, the DPUC concluded that cellular service is not a basic exchange service, but rather a "nonessential" service. Therefore, it should be tariffed to provide a contribution above its cost. While Metro Mobile argues that cellular service is not "nonessential," the DPUC's adherence to its determination in prior cases that cellular service is nonessential is not unreasonable. See DPUC Docket Nos. 84-07-28, p. 4; 86-12-05, p. 4. Metro Mobile itself represented that only 3% of the population of Connecticut now subscribe to cellular service. (ROR, XV, 6, pp. 5-6, Written Exceptions to Decision.) Also, during the DPUC hearing on June 20, 1991, counsel for Metro Mobile conceded that cellular service charges are not part of the residual revenue requirement charges that are paid by the basic exchange rate payers. (ROR, XVIII, 7, Transcript, pp. CT Page 7191 76-77.) It is consistent with the DPUC's policy of fostering universal service, therefore, that cellular service be required to make a contribution above its cost.
In order to apply its ratemaking policy to the establishment of the cellular interconnect rates to be paid by Metro Mobile, the DPUC considered certain evidence in the record and a number of other factors. These included:
 1. Evidence of the cost of the basic exchange service, an element of which is Select-A-Call (SAC). The cellular interconnect rate is determined by applying a surcharge to the SAC rate. The SAC rate is thus a function of the rate to be paid by Metro Mobile.
 2. Evidence of the cost of other services, which would aid the DPUC in determining the level of contribution above cost which would be required of the cellular interconnect service charge paid by Metro Mobile.
 3. The fact that the percentage increase in Metro Mobile's rate would be less than the increase in some other rates.
 4. The fact that the basic exchange rate increased 16%.
 5. The fact that cellular interconnect rates had not been increased since 1984.
 6. The fact that the cellular interconnect rates are lower than the access charges paid by inter-exchange carriers and the toll charges for calls of comparable distances.
In the court's view, these considerations, relied on by the DPUC, are not arbitrary, irrelevant, or unreasonable. Furthermore "[i]n the specialized context of a rate case, the court may not substitute its own balance of regulatory considerations for that of the agency. . . ." CLP v. DPUC,219 Conn. 51, 58 (1991) (citation omitted). Where there is nothing in the law or the record to indicate that the DPUC cannot rely on considerations such as those relied on here, and where the law indicates that rates need not be based on cost or cost plus the need to attract capital, the court must uphold the decision. Metro Mobile's argument, in essence, that its rates should be CT Page 7192 based on a set formula must find support, if at all, in the legislative process, rather than in this court. The court concludes that the DPUC's decision is supported by the record and by proper policy considerations.
UNFAIR COMPETITION
Metro Mobile claims that the DPUC's decision should be reversed because, by raising the cellular interconnect rates by 35%, the DPUC puts Metro Mobile in a position of severe competitive disadvantage to its only competitor, Springwich. As stated above, Springwich is a limited partnership whose general partner, SNET Cellular, is a subsidiary of SNET.
Specifically, Metro Mobile claims that while both Metro Mobile and Springwich must pay the increased cellular interconnect rates to SNETCO, the fact that SNETCO and Springwich are affiliated means that the increase in Springwich's cost and, thus, the decrease in Springwich's profits will be offset by the increase in the cellular interconnect fees paid to SNETCO. Therefore, Metro Mobile argues, the DPUC's decision only requires Springwich to move money from one pocket to another while Metro Mobile must absorb the full, real cost of the increased rates if it wants to remain competitive with Springwich. Metro Mobile's essential argument is that its shareholders will see a smaller return on their investment following the rate increase while shareholders of SNET will not, because the increase in cost to Springwich, and thus SNET's subsidiary, SNET Cellular, is offset by the increase in revenues to SNETCO, also a subsidiary of SNET. Then SNET also receives the increased cellular interconnect fees from Metro Mobile. This so-called advantage to SNET is not the result of cross-subsidization, but is inherent in the relationship between a parent and its subsidiaries. It always exists when an independent carrier competes with the subsidiary of the regulated utility to which both the independent carrier and the subsidiary pay rates. The same is true where an independent carrier (Metro Mobile) competes with a subsidiary (SNET Cellular, general partner of Springwich) of a holding company (SNET), which holding company is also the parent of the regulated utility charging the rates (SNETCO). AS the FCC purposely licensed both an affiliate of SNETCO and an independent carrier to provide cellular service, this court is unable to conclude that some unspecified federal policy or guideline requires the DPUC to set rates in such a way as to compensate for this fact. Metro Mobile's remedy, if any, may lie with the FCC or in the antitrust laws, but not with the court in this appeal.
The court concludes that Metro Mobile's claim of CT Page 7193 competitive disadvantage is not a legal basis for reversing the DPUC's decision.
For all of the above reasons, the appeal is dismissed.
MALONEY, J.